### MAYES v. AMERICAN NAT. INS. CO.
### (No. 2271.)

Court of Civil Appeals of Texas. El Paso. April 11, 1929.

Davis & Wright, of San Antonio, for appellant.

Douglas, Carter & Black, of San Antonio, for appellee.

HIGGINS, J. Mayes brought this suit against the American National Insurance Company to recover damages for an assault upon him committed by one Pierce employed by defendant as a collector of premiums upon policies of insurance issued by it.

At the close of the plaintiff's evidence the defendant moved for an instructed verdict, which motion was granted.

Appellant is an express messenger of the American Express Company living in San Antonio. He carried two policies of life insurance issued by appellee upon which the weekly premiums were 50 cents.

As to the scope of Pierce's authority, it was simply shown he was appellee's collector of insurance premiums. It is sufficient to show he was authorized to collect such premiums.

■ The circumstances under which the assault was committed are sufficiently shown by excerpts from appellant's testimony as follows:

"I know Mr. Pierce, the collector for the American National Insurance Company, when I see him. He called at my home in December, 1926, on the occasion of this trouble, which was on the 26th day of December, between 11:00 and 12:00 o'clock in the morning, close to noon. We had about ten or twelve guests there for dinner, relatives who were taking Christmas dinner with us. I had just come in off my run and that was the occasion for Christmas dinner on the day after Christmas, which was on Monday. I had been home about twenty or thirty minutes and the door bell rang and we were all sitting in the room talking about my run and the work I had performed that night. The door bell rang and I got up and answered the door bell and it was this young man, Mr. Pierce, collecting for the American National Insurance Company. He first asked for my wife and I told him my wife was busy in the kitchen prepar-

ing dinner, that we had company and were going to have our Christmas dinner and that I did not care to see any collectors today, so I shut the door, and I was fixing to call up my boss over the telephone, which was across the living room, and I turned around and sat down on the piano stool and picked up the telephone to use it and the door slammed back and I looked around and Mr. Pierce was standing inside of the room. I sat the telephone down and got up and walked over to the door and he backed out of the door and I said, 'Young man, I told you once, like a gentleman, that I am not going to see any collectors today, and I mean it.' I shut the door again and went back to use the telephone. I called up my boss, and I guess five or ten minutes after that somebody spoke up in the room and called my attention to the boy still being out on the porch, so I got back up and went out there to the front door again. I did not open the door but I looked out through the glass, the top half of the door is glass, and he was standing on the porch writing something in his book. So I opened the door and he turned around with his book under his arm and I said to him, 'I have already told you twice young man, like a gentleman, that I won't see any collectors today, that I am not paying any bills, it is Christmas and I am entertaining Christmas guests.' So he said, 'By God, if you come out of that door you will see whether you pay any bills or not,' so I opened the door and walked on out and left the screen shut behind me. I said, 'Young man, do you realize you are in my house and that you can get in a whole lot of trouble if you don't go on,' and I started to catch hold of his arm and when I did he hit me in the face with something coming out of his pocket, it looked like a closed pocket knife, and he knocked me unconscious. He hit me in the face right here, this is the scar here. It must have been about an hour before I regained consciousness and after I regained consciousness I did not have any sense, or rather, I was in a dazed condition all day. I was suffering pain and my face was swollen and stayed swollen for about two weeks. * * *

"At the time I learned that Mr. Pierce was still out on the porch I went to the door and he had his insurance book, as I stated before. I don't know the name of that book but it was a collection book and I had seen him use it before. I believe he had it under his arm, his left arm, at that time. Just before he struck me had his right hand in his right pocket and I had no idea that he was going to strike me. Just before he struck me I put my open hand on his arm and was talking to him, but was not talking in a loud voice, I just asked him if he realized he was in my house and that he was· liable to get into trouble. * * *

"As I stated, on the occasion of this trouble Mr. Pierce came to the door and knocked and I had the conversation with him which I have detailed. I should have said he rang the door bell, he did not knock, but he rang the door bell and then I had the conversation that I detailed and went on back in the house and he then came into the house. He did not come into the house the first time. He did not have my invitation or consent to come into the house. * * *

"When I was hit I fell immediately. I never struck Mr. Pierce at all, I just simply stepped out of the screen door and motioned my hand to him like this (illustrating) and said, 'Young man, I told you twice like a gentleman that I did not care to see any collectors and if you don't go on you are liable to get into trouble.' I said, 'I am not paying any bills today,' and he said, 'By God, you come out of that door and we will see whether you will pay any bills today or not.' I think the door was open when he uttered that oath, I think I had opened the door and the ladies I spoke of were just inside of the living room. * * *"

The question at issue is whether upon the facts stated the doctrine of respondeat superior is applicable.

In determining whether a wrongful act of an employee is of such character as imposes liability therefor upon the master, the test is whether there was express or implied authority to do the act complained of, or, as it is commonly stated, whether the act was done "within the scope of the employment." If so, the master is liable. Conversely he is not liable if the act was not within the real or apparent scope of the master's business. 18 R. C. L. Title Master and Servant, §§ 252, 253, 254; International & G. N. Ry. v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902; International & G. N. R. Co. v. Cooper, 88 Tex. 607, 32 S. W. 517; Burnett v. Oechsner, 92 Tex. 588, 50 S. W. 562, 71 Am. St. Rep. 880; Southwestern Portland Cement Co. v. Reitzer (Tex. Civ. App.) 135 S. W. 237.

As was stated by Judge ·Gaines in the Anderson Case, supra:

"The practical effect of this instruction was to induce the jury to believe that the burden was upon the defendant to show that the brakeman who ejected the plaintiff from the car was not acting within the scope of his authority. The burden was upon the plaintiff to prove the facts which would entitle him to recover. When a recovery is sought of the master for an injury inflicted by his servant, the plaintiff must show that the servant did the wrong while acting within the scope of his employment. It follows that, unless we can say that a brakeman has an implied authority to eject trespassers from the train upon which he is employed, the charge was error, for which the judgment must be reversed.

"To hold the master liable for the act of his

servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary to his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed. For the mode in which the servant performs the duty he is engaged to perform, if wrongful and to the injury of another, the master is liable, although he may have expressly forbidden the particular act. But whether the act in question can be implied from the general authority conferred upon the servant must in general depend upon the nature of the service he is engaged to perform and the circumstances of the particular case."

Assault cases present no exception to the foregoing rule, and where the employment necessarily involves the right of the servant to use force as in the case of watchmen and others to whom has been committed the duty of guarding the master's premises or keeping order thereon, and such servant uses force unnecessarily or uses greater force than is reasonably necessary, the master is liable for the resulting damage. 39 C. J. 1308, § 1507.

■ In the case at bar the burden rested upon the plaintiff to show that the assault was committed by Pierce within the scope of his employment, and unless it can be said that authority to do the act in question can be implied from the nature of his service and the circumstances of this case, then plaintiff has failed to meet the burden imposed upon him (Anderson Case, supra) and the peremptory charge was properly given.

In this record there are no circumstances upon which to base an inference that appellee in any wise authorized Pierce to use force or other coercive measures in collecting premiums, and we do not think it is to be implied.

To assault and beat a debtor is not a recognized or usual means employed for the collection of a debt. Collette v. Rebori, 107 Mo. App. 711, 82 S. W. 552. It does not even here appear that the premium which Pierce sought to collect was past due and already earned by appellee. We think it is not to be inferred that appellee would authorize or assent to its collectors using any force or other coercive measures in collecting the small weekly payments upon its policies of the industrial type, for it would necessarily be harmful to its business by causing such policyholders to permit the policies to lapse.

Without discussing the question further, our conclusion is that the assault was committed by Pierce in a private brawl and not in the scope of his employment by appellee.

Defendant, in addition to a general denial, pleaded that Pierce was assaulted by the plaintiff and in warding off the blows he was acting in his own necessary defense, and, moreover, plaintiff provoked the difficulty. Appellant asserts that by this special plea appellee supported and approved the conduct of Pierce and precludes it from saying Pierce was not acting in the course of his employment; or, at any rate, such plea is a circumstance to be considered in connection with the evidence upon the vital issue in the case.

■ This proposition is untenable, for the defendant had the right to plead inconsistent defenses; if indeed such plea may be at all considered inconsistent with appellee's contention that the assault was not committed in the course of Pierce's employment.

The remaining question in the case relates to the refusal of the court to grant a new trial upon the ground of newly discovered evidence. This matter presents no error, for such evidence, if heard, would have no probative force upon the controlling question in the case.

Affirmed.